IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ALEXANDER RIEGLER,

Plaintiff,

vs.                                        Civil Action No.
                                           1:04-CV-1314 (DEP)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

OFFICE OF PETER M. MARGOLIUS    PETER M. MARGOLIUS, ESQ.
7 Howard Street
Catskill, New York 12414

FOR DEFENDANT:

HON. GLENN T. SUDDABY           WILLIAM H. PEASE, ESQ.
United States Attorney          Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York  13261-7198

OFFICE OF GENERAL COUNSEL       BARBARA L. SPIVAK, ESQ.
Social Security Administration  Chief Counsel, Region II
26 Federal Plaza
New York, New York 10278        SUSAN REISS, ESQ.
                                Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

DECISION AND ORDER

Plaintiff Alexander Riegler, who suffers from an array of potentially limiting physical and mental conditions, including principally a cervical spine condition and an elbow impairment both of which have resulted in surgical intervention, Hepatitis C, alcohol abuse, a personality disorder and borderline intellectual functioning, has commenced this proceeding seeking judicial review of the denial of his application for supplemental security income ("SSI") Social Security benefits.  In support of his challenge, plaintiff maintains that the administrative law judge ("ALJ") assigned to determine plaintiff's benefits application failed to follow the directions of the Social Security Administration Appeals Council, which remanded the matter following an earlier, unfavorable decision, ignored and/or failed "to clarify" certain evidence, and abandoned his role as an impartial trier of facts.  Plaintiff also maintains that the Appeals Council later erred by refusing to consider new evidence when denying review of the ALJ's second decision denying benefits.

Having carefully reviewed the record now before the court, while rejecting plaintiff's challenge regarding the ALJ's impartiality, I find that the ALJ erred by failing to follow the instructions provided by the Appeals

2

Council, and by not comprehensively discussing and weighing certain relevant evidence, and that his finding of no disability lacks the support of substantial evidence.  I also find that the Appeals Council erred by failing again to remand this matter, in light of the new evidence submitted.  I therefore reverse the determination of no disability.  Moreover, in light of the length of time during which the plaintiff's application has been pending and the considerable evidence suggesting that plaintiff is unable to perform in any work environment, I direct a finding of disability and remand the matter solely for a prompt calculation of benefits owed.

I.      BACKGROUND

        A.      General Background

        Plaintiff was born on August 12, 1959; at the time of the first administrative hearing in this matter, he was forty years old.  Administrative Transcript at 44.[1]  During most of the period at issue, plaintiff lived alone in a motel room.[2]  AT 45, 84.  Plaintiff has never obtained a driver license.  AT 45-46.

---

        [1]      Portions of the administrative transcript, Dkt. No. 11, which was filed by the Commissioner together with the agency's answer, will be cited as "AT __."

        [2]      At one point plaintiff was placed into a family home.  AT 477-78.  That arrangement, however, failed principally as a result of Riegler's unusual and somewhat disruptive behavior.  *Id.*

The extent of plaintiff's formal education is limited to completion of the tenth grade.  AT 78, 95.  Plaintiff has worked as a self-employed carpenter, and as a construction laborer in a position which involved using his carpentry skills, installing sheet rock, and painting.  AT 47, 60.  Plaintiff has also previously worked for a lumber company, loading wood onto a conveyor belt.  AT 95.

B.   Treating Sources

In March 1998, plaintiff began treating with Drs. Samuel Merkhan, Tamton Mustapha, and other professionals at Prime Medical Associates, P.C. in Catskill, New York.  AT 376.  Plaintiff was seen on March 10, 1998 as a new patient by Dr. Merkhan, who diagnosed him as suffering from abdominal pain.  AT 376.  Following continued complaints of abdominal pain, on March 31, 1998, Dr. Merkhan noted that plaintiff "does have elevated liver enzymes with an unremarkable ultrasound of the abdomen which raises the possibility of hepatitis."  AT 378.  On April 8, 1998, Riegler was diagnosed as suffering from Hepatitis C, and was subsequently treated for that condition with Interferon, an injectable medication.[3]  AT 356-57, 379, 383-85.  Plaintiff's Interferon treatments

---

[3]     Interferon is indicated for the treatment of chronic Hepatitis C, and is administered by injection.  *Physicians' Desk Reference* 2918-2919 (59th ed. 2005).

were discontinued by Dr. Mustapha in May of 2000.  AT 677.

In addition to Hepatitis C, plaintiff has received treatment from Dr. Mustapha and other professionals at Prime Medical Associates for chronic pain syndrome, abdominal and low back pain, reflux esophagitis, heartburn, sore throat, and a cough.  AT 343, 379, 381-83, 385, 684.  That treatment consisted of addressing plaintiff's symptoms through a variety of means, including through the use of medications such as Rebotron, Ibuprofen TID, Zantac, Ventolin, Elavil, Ultram and Prilosec.  AT 354, 356, 376, 381, 684.

While treating with Prime Medical Associates, plaintiff also sought the assistance of other physicians for various conditions.  On March 3, 1998, for example, plaintiff saw Dr. James M. Schneider, an orthopedist, complaining of right elbow pain.  AT 267.  Dr. Schneider noted that plaintiff had dislocated his right elbow in December 1997, and recommended that he receive "aggressive physical therapy."  *Id.*  During March and April of 1998, Riegler underwent physical therapy for both elbows.  At 258-64.  On May 22, 1998, Dr. Schneider noted that plaintiff had "considerable

---

Because the plaintiff was unable to inject himself with the medication, visiting nurses provided that service in his home from March to May of 1999.  AT 392-468.  It appears that plaintiff was later successfully taught self-injection techniques.  AT 384.

improvement in both his pain and range of motion", but found that plaintiff needed two more weeks of physical therapy.  AT 266.

Plaintiff has also received considerable care and treatment for a neck condition.  Beginning in May 2000, Riegler treated with Dr. Darryl J. DiRisio, a neurosurgeon, for that condition.  AT 647.  Dr. DiRisio found that plaintiff had "significant cervical spondylosis and myelopathy secondary to the spondylosis."  AT 646.  Plaintiff elected to have Dr. DiRisio perform cervical reconstructive surgery.  AT 646.  Following that surgery, plaintiff was treated with medication, including Lorcet, Oxycontin, Valium, and Flexeril, and in July 2000, was sent for physical therapy for both shoulders.  AT 645, 703-05.  On August 4, 2000, Dr. DiRisio opined that plaintiff was "doing okay" although he continued to experience "some chronic pain issues."  AT 644.  Dr. DiRisio later noted on October 10, 2000, that plaintiff "is doing very well overall" and that x-rays looked "excellent" and "[t]here is perfect alignment," adding, however, that he has "severe neck pain that has continued despite our best efforts with re-aligning his spine."  AT 642.  It was noted by Dr. DiRisio that plaintiff "will be going to Pain Management", and Flexeril was prescribed to address his pain.  *Id.*  On January 2, 2001, Dr. DiRisio recorded that plaintiff is "doing

okay" and that "[o]verall, he has not had any progression of neurologic symptomatology" but continues to have "significant" pain in his lower neck and pain in his shoulders.  AT 641.

From August 2001 until October of 2002, plaintiff treated with Dr. Gabriella Kovi, of the Pain Management Center.  AT 503.  Dr. Kovi found that plaintiff had "extensive neck pain status post fusion of the cervical spine" and "right elbow pain due to dislocation in 1997."  AT 503-04. While seeing Dr. Kovi, plaintiff received an epidural steroid injection and was prescribed various medications, including Zanaflex and Oxycontin. AT 500-09.

Beginning in January 2001, plaintiff was treated for his Hepatitis C by Dr. Richard G. Clift, a gastroenterologist.  AT 497-98.  Dr. Clift noted that plaintiff was previously treated with Rebetron[4] for approximately one year, while under the care of Dr. Mustapha, but was non-responsive to that treatment.  AT 493, 497.  Under Dr. Clift's care, plaintiff started treatment with "Peg Intron,"[5] but "ultimately stopped taking the injections."

---

[4]     Rebetron is indicated, in combination with Interferon injections for the treatment of chronic Hepatitis C in patients with compensated liver disease previously untreated with Alpha Interferon or who have relapsed following Alpha Interferon therapy.  *Physicians' Desk Reference* 3059 (59th ed. 2005).

[5]     Intron is another medication utilized for the treatment of Hepatitis C. *Physicians' Desk Reference* 3038 (59th ed. 2005).

AT 492-93.  On July 16, 2002, Dr. Clift noted that plaintiff was "not a good candidate for treatment with PEG intron and ribavirin at this time as he has a recent history of alcohol use.  In addition he has an undetermined opthamologic problem."  AT 491.  Dr. Clift "strongly advised" plaintiff not to drink alcohol.  *Id.*  On March 11, 2003, Dr. Clift noted that plaintiff had recently tried "pegylated interferon and ribavirin," but did not tolerate that regimen due to severe abdominal pain.  AT 488.  Dr. Clift opined that plaintiff may have erosive esophagitis,[6] recommended that an endoscopy be performed, and prescribed Aciphex.  AT 488-89.

B.    Consultative Examiners

In addition to receiving the foregoing treatment for his various physical and mental conditions, plaintiff was examined consultatively on several occasions.[7]  On September 13, 2000, plaintiff was examined consultatively by Dr. Richard L. Uhl, an orthopedist.  AT 670.  Dr. Uhl noted plaintiff's complaints of shoulder pain, and recommended that he undergo magnetic resonance imaging ("MRI") testing to evaluate his left shoulder.  *Id.*  An MRI performed on October 31, 2000 revealed findings

---

[6]    Esophagitis is an inflammation of the esophagus.  *Dorland's Illustrated Medical Dictionary* 643 (30th ed. 2003).

[7]    These consultative examinations do not appear to have been performed at the request of the agency.

compatible with rotator cuff tendinopathy.  AT 649.

Plaintiff was also examined consultatively by Dr. Craig R. Goldberg, a neurosurgeon, on April 1, 2003.  AT 486-87.  Based upon his examination, Dr. Goldberg concluded that he could provide no further surgical intervention for the plaintiff, and noted that continued pain management "is likely to result in some significant improvement" for him. AT 487.

Plaintiff has also been examined by Nurse Marie Maxwell and Dr. Abdul Hameed, of the Green County Mental Health Center in Cairo, New York.  AT 359-60, 472-76.  On July 5, 1999, Nurse Maxwell conducted a mental status evaluation of the plaintiff.  AT 359-60.  Based on her assessment, Ms. Maxwell reported that plaintiff "will do well in a supervised setting, and with a case manager.  Left to his own resources, he will continue to exercise poor judgment leading to inappropriateness, impulsive 'acting out', and further bouts with law enforcement.  He exhibits engaging behaviors and is 'easily led.'"  AT 360.  Plaintiff was examined on October 19 and 29, 1999, by Dr. Abdul Hameed, who diagnosed him as suffering from a personality disorder not otherwise specified, and concluded that plaintiff is unable to live independently without a network of

a support system, unable to handle money in his own best interest, and

cannot engage in any gainful employment.  AT 476.

     C.    <u>Agency Consultative Examiners</u>

     Plaintiff was also examined consultatively by the several

professionals at the request of the agency.  Dr. John Seltenreich

conducted a psychiatric evaluation of plaintiff on June 30, 1998.  AT 268-

69.  Based on his evaluation, Dr. Seltenreich offered an Axis I diagnoses

of alcohol dependence and an Axis II diagnosis of personality disorder, not

otherwise specific, with antisocial features.  AT 269.  Dr. Seltenreich

commented that plaintiff "presents as somewhat immature and antisocial

and generally might be thought of having defects in character" for which

he would benefit from psychiatric care and counseling.  AT 269.  Dr.

Seltenreich concluded that plaintiff's prognosis was "somewhat poor" as

he "appears to be poorly motivated."  AT 269.

     Plaintiff was also examined on June 30, 1998, by Dr. Joseph Kelly,

an orthopedic specialist.  AT 270-73.  Based on his examination, Dr. Kelly

concluded that plaintiff's prognosis was "guarded" and that plaintiff would

be impaired for activities that required "any significant amount" of walking

or standing, and "any climbing, kneeling or squatting, and any activities

that would require strenuous use of the right upper extremity."  AT 271-72.

On August 6, 1998, plaintiff was again examined consultatively by Dr. Kelly.  AT 274-85.  Based on this second examination, Dr. Kelly found that plaintiff's range of motion in his upper extremities was not limited, concluding that plaintiff's prognosis was "good" and that he had "no specific physical impairment."  AT 275-76.

Plaintiff was again examined consultatively on March 16, 1999, by Dr. Seltenreich, who conducted psychiatric and organicity evaluations.  AT 311-17.  Based on his examinations, Dr. Seltenreich offered Axis I diagnoses of alcohol dependence, drug dependence in sustained full remission, and dysthymia, and an Axis II diagnosis of personality disorder, not otherwise specified, with antisocial features.  AT 313.  In a medical source statement set forth in both evaluations, Dr. Seltenreich opined that plaintiff may have some mild difficulties dealing with the normal stresses of a competitive workplace, and concluded that plaintiff's prognosis was "fair" provided he achieves sobriety and receives appropriate help.  AT 313-14, 317.

Plaintiff was also examined consultatively on March 16, 1999, by Dr. George Wootan, who conducted orthopedic and internal medicine

examinations.  AT 318-33.  Based on those examinations, Dr. Wootan diagnoses plaintiff as suffering from Hepatitis C, costochondritis, and chronic back and neck pain.  AT 320, 324.  Dr. Wootan opined that plaintiff "should be capable" of engaging in activities which require sitting, standing, walking, and using stairs, as well as – according to plaintiff's own statement – lifting twenty-five to thirty pounds.  *Id.*  Dr. Wootan noted in both reports that "there is a discrepancy in what the claimant says and what is really going on.  There was some inconsistency in his history [which] seemed to be a little bit too fluid for the situation."  *Id.*

On December 13, 2000, plaintiff was again examined consultatively by Dr. Wootan, who conducted both orthopedic and internal medicine evaluations.  AT 650-59.  Based on his examinations, Dr. Wootan concluded that plaintiff has full use of both upper and lower extremities, and is able to engage in activities which require sitting, standing, walking, and using stairs, as well as lifting and carrying "with some restriction, but not a significant restriction, 20-25 pounds."  AT 652-53, 658.  Dr. Wootan again noted inconsistencies which occurred during the examination.[8]  AT

_____

[8]     As one example, cited by the ALJ in his decision, Dr. Wooten noted that when asked to remove his collar and t-shirt, the plaintiff was able to reach over his head to do so, yet when later directed by Dr. Wooten to raise his arms he exhibited great difficulty.  AT 658.

652, 658.

Plaintiff was also examined consultatively on December 13, 2000, by Dr. Annette Payne, who conducted psychiatric and organicity reviews. AT 660-69.  Based on her examinations, Dr. Payne offered Axis I diagnoses of "chronic pain disorder associated with both the psychological and general medical condition," as well as "polysubstance dependence (6 years clean)," and an Axis II diagnosis of personality disorder, not otherwise specified, antisocial.   AT 663, 668.  Dr. Payne commented that plaintiff's prognosis was "fair", and that his psychiatric difficulties were "mildly limiting."  AT 663, 668-69.

D.    RFC Assessments

The record also contains several residual functional capacity ("RFC") assessments completed by agency consultants in 1998 and 2001.  AT 286-306, 616-40.  The earlier assessments include a mental RFC assessment completed by Dr. Arlene Reed-Delaney on September 15, 1998, in which it is indicated that plaintiff is moderately limited in his abilities to understand, remember, and carry out detailed instructions; to interact appropriately with the general public; to get along with coworkers and peers without distracting them or exhibiting behavioral extremes; and

13

in setting realistic goals or making plans independently of others.  AT 286-87.  Dr. Reed-Delaney also reported that plaintiff has no limitation or restriction in the functions of daily living, or in maintaining social functioning, deficiencies of concentration, persistence or pace, nor did he experience any episodes of deterioration or decompensation.  AT 297.

Dr. Reed-Delaney also completed a physical RFC assessment, dated September 15, 1998, in which she recorded that plaintiff  has the abilities to lift and/or carry up to fifty pounds occasionally; and up to twenty-five pounds frequently; and to stand and/or walk, and to sit, for about six hours in an eight-hour workday.  AT 300.  Addressing plaintiff's postural limitations, Dr. Reed-DeLaney noted that plaintiff was limited to occasionally climbing and balancing, and should not kneel or crawl.  AT 301.  Regarding environmental limitations, Dr. Reed-DeLaney noted that plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation.  AT 303.

The later RFC Assessments in the record include a mental RFC assessment form completed by Dr. Richard B. Weiss on January 4, 2001.  AT 616-18.  In it, Dr. Weiss reported that plaintiff was moderately limited in

14

his abilities to understand, remember, and carry out detailed instructions; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals or make plans independently of others. AT 616-17. Dr. Weiss also opined that plaintiff was not restricted in the activities of daily living, but had moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, or pace. AT 637.

The record also contains a physical RFC assessment completed by "D. Montavon on January 16, 2001."[9] AT 619-26. That assessment form reflects that plaintiff has the abilities to lift and/or carry up to twenty pounds occasionally, and up to ten pounds frequently; and to stand and/or walk, and to sit, for about six hours in an eight-hour workday. AT 620. Regarding postural limitations, the form reveals that plaintiff is limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. AT 621.
The assessment also reflects that insofar as manipulative limitations are concerned, plaintiff is limited in "reaching all directions." AT 622. The form further notes the existence of environmental limitations, requiring the

---

[9]    The qualifications of this individual are not apparent from the record, and accordingly are unknown to the court.

plaintiff to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  AT 623.

The record also contains an undated employability assessment completed in or about September of 2003 by Dr. Tracey Erney, a family practitioner in Cairo, New York.  AT 560-61.  That assessment indicates that physically, plaintiff is moderately limited in his abilities to lift, carry, push, pull, bend, and use hands.  AT 560.  Addressing plaintiff's mental functioning, the report concludes that he is very limited in his abilities to understand and remember instructions and maintain attention and concentration, and limited moderately in his abilities to carry out instructions, make simple decisions, maintain basic standards of personal hygiene and grooming and appear able to function in a work setting at a consistent pace.  *Id*.

E.    Other Evidence

The record also contains documents from several different social services organizations which over time have provided plaintiff with various services.  The record includes, for example, a March 23, 1998 letter from Lolly St. Clair, Senior Counselor of Twin County Alcohol and Substance Abuse Services, Inc. to the Greene County Department of Social Services

("DSS").  AT 257.  In that letter, it was noted that plaintiff presented for an evaluation on two occasions, but that it was "impossible" to evaluate him because he provided conflicting information and exhibited memory problems and inappropriate behavior.  *Id*.

The record also contains various documents from the DSS.  AT 477. In a November 10, 1999 letter to the ALJ from several DSS personnel, plaintiff's living situation, medical history, criminal background, and drug usage were reviewed.  AT 477-78.  The letter reported that plaintiff's "survival skills seem questionable;" that plaintiff "has trouble following medical advice," and that he may need "a more restrictive setting sometime in the next year or two."  AT 478.

In an undated statement from DSS Nurse Carole Truesdell, it was noted that plaintiff "is a mentally disturbed person."  AT 365.  In a second statement, dated July 20, 2000, Nurse Truesdell stated that she had worked with plaintiff "over the past few years" and opined that she had "never seen him appearing as ill as he does now."  AT 698.

The record also contains documents from personnel affiliated with Mental Health Association of Columbia-Greene Counties, which provided plaintiff with case management and vocational services.  AT 556, 558.

17

Letters dated May 27, 2003 and August 14, 2003 from personnel with that agency to plaintiff's counsel, reflect their opinions that plaintiff is unable to perform any meaningful employment. *Id.*

II.   PROCEDURAL HISTORY

    A.   Proceedings Before the Agency

Plaintiff filed an application for SSI benefits on April 23, 1998, alleging a disability onset date of March 15, 1994.  AT 206-14.  That application was denied, both initially and on reconsideration.  AT 111-14, 117-20.

At plaintiff's request, a hearing was conducted on October 14, 1999 before ALJ Carl E. Stephan.  AT 40-73.  Following the hearing, at which plaintiff was represented by counsel, ALJ Stephan rendered a decision on January 27, 2000 in which he found that despite his many physical and mental conditions, the plaintiff is not disabled.  AT 158-66.   On request by the plaintiff for review of that unfavorable determination, the Appeals Council remanded the matter on July 26, 2002 to ALJ Stephan for further consideration.  AT 173-76.  In its decision, the Appeals Council determined that the ALJ failed to evaluate certain evidence, and did not evaluate plaintiff's mental impairments in accordance with the special

technique described in 20 C.F.R. § 416.920a.[10]  AT 174.

Following the remand, ALJ Stephan held a supplemental hearing on

March 6, 2003, later continuing the hearing to allow plaintiff to secure

additional medical evidence.  AT 74-90, 91-108.  Plaintiff was represented

by counsel throughout the course of the supplemental hearing.  AT 76, 93.

Following the close of the supplemental hearing, ALJ Stephan

issued a second decision, dated October 30, 2003, again finding that the

plaintiff was not disabled at the relevant times, and thus upholding the

denial of his application for benefits.  AT 17-37.  In his decision, ALJ

Stephan applied the familiar, five step sequential analysis to determine the

issue of disability.  After concluding at step one that plaintiff had not

engaged in any substantial gainful activity during the relevant period, ALJ

Stephan next proceeded to analyze the medical evidence, concluding at

steps two and three that plaintiff suffers from multiple impairments,

including personality disorder, status post fusion of the cervical spine,

history of drug and alcohol abuse, chronic Hepatitis C, back pain, status

post elbow surgery, and borderline intellectual functioning, which are

---

[10]    In the interim, plaintiff filed another application for SSI benefits on July 27,
2000.  AT 566-69.  The application was denied initially on January 16, 2001, AT 562,
and it appears that plaintiff failed to file a request for a hearing to address that
application within the allowed time period.  *See* AT 562C, 562E, 563.

sufficiently severe as to impair his ability to perform basic work activities, but not of the severity required to meet or medically equal any of the listed, presumptively disabling impairments set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, particularly focusing on the "musculoskeletal listings, and the "A, B or C requirements of Appendix 1", relating to mental disorders." [11] AT 31-32.

The ALJ next turned to assessment of the plaintiff's RFC.  AT 32. After reviewing the extensive medical evidence in the record, ALJ Stephan concluded that plaintiff retains the RFC to perform simple, low stress light work without constant interaction with others.[12]  AT 32.  The ALJ also

---

[11]     ALJ Stephan also noted plaintiff's history of asthma and liver disorder, but determined that those conditions were not sufficiently severe, for purposes of step two of the disability analysis.  AT 31-32.  Plaintiff does not challenge this portion of the ALJ's determination.

[12]     By regulation light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967.

concluded that plaintiff's conditions imposed further limitations, finding that he can only perform the exertional demands of light work not involving more than occasional climbing, stooping, bending, crouching and crawling, with no exposure to dust, fumes, smoke, chemicals, noxious gasses, extremes of temperature and humidity.  *Id.*  In arriving at his RFC determination, the ALJ considered plaintiff's subjective complaints, but found them not to be fully credible given his history of multiple somatic complaints, inconsistent examinations, alcohol abuse, and noncompliance with treatment.  AT 32.

Applying his RFC findings, ALJ Stephan concluded at step four that plaintiff is unable to perform his past relevant work as a carpenter and laborer based on the testimony of the vocational expert.  AT 34.  After reviewing the medical vocational guidelines (the "grid") set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P., App. 2, and utilizing the grid as a framework, noting that a conclusion of no disability would be dictated, ALJ Stephan then considered the testimony of Dr. Leona Liberty, a vocational expert, which was elicited to determine whether the limitations imposed by plaintiff's condition so eroded the range of available jobs indicated by use of the grid as to negate its applicability in plaintiff's case.  AT 35.  Based

upon a hypothetical question posed to the expert, containing features

closely approximating plaintiff's limitations, *see* AT 100-01, the ALJ

concluded that there are several positions available in the national and

local economies which plaintiff is capable of performing, notwithstanding

his limitations, including as a small product assembler and mail sorter.[13]

AT 35.  On that basis, the ALJ concluded that plaintiff was not disabled.

AT 35-36.

　　　The ALJ's decision became a final determination of the agency

when, on October 24, 2004, the Appeals Council denied plaintiff's request

for review.  AT 1e-4.  In making its determination, the Appeals Council

received as new evidence the employability assessment completed by Dr.

Erney, but did not find this evidence sufficiently persuasive to provide a

basis for changing the ALJ's decision.  *Id.*

　　　B.　　This Action

　　　Plaintiff commenced this action on November 12, 2004.  Dkt. No. 1.

Issue was thereafter joined by the Commissioner's filing of an answer,

accompanied by an administrative transcript of the evidence and

---

[13]　　When the question was altered to add the restriction that the hypothetical person must perform low-stress, simple work involving no interaction with the public and infrequent contact with co-workers or supervisors, according to the expert only mail sorting was left as a suitable position.  AT 102.

proceedings before the agency, on May 5, 2005.  Dkt. Nos. 6, 7.  With the filing of plaintiff's brief on June 20, 2005, Dkt. No. 8, and a brief on behalf of the Commissioner on September 16, 2005, this matter is ripe for determination, and has been referred to me, on consent of the parties, for a final determination pursuant to 28 U.S.C. § 636(c).  *See* Dkt. No. 14.

III.   DISCUSSION

     A.   Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148.  If, however, the correct legal standards have been applied and the ALJ's

23

findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Id.*; *Martone*, 70 F. Supp. 2d at 148 (citing *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464

24

(1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.    Disability Determination - The Five Step Evaluation Process

25

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or

26

combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled". *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education,

27

past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585;

*Martone*, 70 F. Supp. 2d at 150.

C.    The Evidence In This Case

In a brief which is somewhat bereft of specifics regarding the bases

for his contentions, plaintiff raises several claims in support of his

challenge to the agency's determination, arguing that the ALJ 1) failed to

follow the direction provided by the Appeals Council, to the effect that he

should consider certain treating sources' opinions and explain the weight

given to those opinions; 2) ignored and/or failed "to clarify" certain

evidence; and 3) abandoned his role as an impartial trier of facts.[14]

Plaintiff also contends that the Appeals Council erred by failing to remand

on the basis of the new evidence.

_____ 1.    Treating Physician

Ordinarily, the opinion of a treating physician is entitled to

considerable deference, provided that it is supported by medically

acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588;

---

[14]    In setting forth these contentions, plaintiff fails to cite any supporting case law or regulations, nor is there any detailed discussion of favorable evidence in the record.  *See* Dkt. No. 8.

*Barnett*, 13 F. Supp. 2d at 316.[15]  Such opinions are not controlling,

however, if contrary to other substantial evidence in the record.  *Veino*,

312 F.3d at 588.  Where conflicts arise in the form of contradictory medical

evidence, their resolution is properly entrusted to the Commissioner.  *Id.*

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3

F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527,

416.927).

When a treating physician's opinions are repudiated, the ALJ must

provide reasons for the rejection.  20 C.F.R. § 416.927(d)(2).  Failure to

---

[15]      The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions from your treating
> sources . . . If we find that a treating source's opinion on the
> issue(s) of the nature and severity of your impairment(s) is
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other
> substantial evidence in your case record, we will give it
> controlling weight.   When we do not give the treating
> source's opinion controlling weight, we apply [various factors]
> in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions.  *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp. 2d at 316-17.

In returning the matter to him, the Appeals Council noted that in his initial determination ALJ Stephan failed to discuss or evaluate Dr. Mustapha's opinion set forth in Exhibit 19F, and Dr. Hameed's opinion set forth in Exhibit 21.  AT 174.  The Appeals Council therefore gave specific instructions to the ALJ to "[g]ive consideration to the treating source opinions, pursuant to the provisions of 20 C.F.R. [§] 416.927 and Social Security Rulings 96-2p and 96-5p and explain the weight given to such opinion evidence."  AT 175.

A review of the ALJ's decision reveals that unfortunately, he failed to heed the Appeals Council's instructions.  In his most recent decision, ALJ Stephan did not discuss Dr. Mustapha's opinion, nor did he indicate what weight, if any, was given to that opinion.  Moreover, while the ALJ addressed findings made by Dr. Hameed in October of 1999, opining that the plaintiff "could not be gainfully employed[,]"  AT 22, he failed to explain the weight given to this opinion and the basis for his apparent rejection of

Dr. Hameed's conclusions.

In light of the foregoing, I find that the ALJ failed to follow the instructions of the Appeals Council by failing to assess properly these treating source opinions. Accordingly, this matter is subject to a remand for a proper evaluation of the opinions rendered by Drs. Hameed and Mustapha, pursuant to the provisions of 20 C.F.R. § 416.927.[16]

## 2.    Consideration of Certain Evidence

Plaintiff makes various arguments asserting that the ALJ ignored and/or failed "to clarify" certain documents and reports in the record which, he claims, demonstrate his inability to perform substantial gainful activity. Dkt. No. 8 at ¶¶ 2-3, 18-20, 22. Before examining the disputed evidentiary materials, I note that in his or her decision an ALJ is not obligated to address specifically each piece of evidence included within the record. *Jones v. Barnhart*, No. CV-04-2772, 2004 WL 3158536, at *6 (E.D.N.Y. Feb. 3, 2004). It is enough to note that careful consideration has been given to the exhibits presented in reaching a decision, and that the crucial

---

[16]    Plaintiff also argues that the ALJ "failed to apply the treating physician rule" because he "ignored" the opinions of DSS Commissioner Carole Wallace, and DSS Job Coach Michael Downey. Dkt. No. 8 at ¶ 21. After a review of the documents submitted by Commissioner Wallace and Mr. Downey, the court can discern no basis for application of the treating physician rule to these individuals, nor does the plaintiff suggest why the treating physician rule should apply to these individuals.

factors in any determination are set forth with sufficient specificity to
enable the court to decide whether the determination is supported by
substantial evidence.  *Id.* (quotations and citations omitted).

          a.    Job Coaches and Social Service Workers

      Plaintiff claims that while the ALJ "parrots briefly" the testimony of
job coaches and social service workers, he "never clarifies why he
disagrees" with their testimony.  Dkt. No. 8 at ¶¶  19, 22.

      With regard to plaintiff's job coaches, the record contains a May 27,
2003 letter addressed to plaintiff's counsel from Patricia Sirianni,
Supported Employment, and Michael Downey, Job Development/Job
Coach, of Mental Health Association of Columbia-Greene Counties, Inc.
AT 556.  In the letter, Ms. Sirianni and Mr. Downy opine that plaintiff is
unable to perform any meaningful employment.  AT 556.  In a letter dated
August 14, 2003, Mr. Downey, reiterates this assertion.  AT 558.

      In his decision, the ALJ reviewed these letters at some length.  AT
24.  The ALJ then went on to explain that in his view, the opinions were of
"limited probative value regarding the claimant's employability since they
are not experts recognized by Social Security law and regulations."  *Id.*
Accordingly, and contrary to plaintiff's assertion, the ALJ properly

explained why he gave limited weight to the opinions rendered by

plaintiff's job coaches.  I note that the ALJ was allowed to assign less than

controlling weight to these opinions because they were not rendered by

"acceptable medical sources" who can provide opinions establishing an

impairment.  *See* 20 C.F.R. § 416.913(a).  Moreover, the ALJ was not

required to find plaintiff disabled based on these opinions; the "ultimate

finding of whether a claimant is disabled and cannot work is 'reserved to

the Commissioner.'"[17] *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)

(citation omitted)); 20 C.F.R. § 416.927(e)(1).

With regard to the social service workers, the record contains a

November 10, 1999 letter addressed to ALJ Stephan from several

individuals at the DSS, including Carol W. Wallace, Commissioner,

Penelope L. Fromer, PSA Supervisor, Stephen Diffendale, PSA

Caseworker, and Anne L. DeWitt, Director of Services.  AT 477-78.  In the

letter, these professionals provide a brief summary of the DSS's

involvement with plaintiff, and conclude that plaintiff's "survival skills seem

---

[17]     This is not to say, as will be seen, that these opinions of social services job specialists familiar with the plaintiff, and apparently experienced in vocational placement of individuals in similar circumstances, consistently concluding that the plaintiff cannot perform in a work setting, are not persuasive evidence that Riegler's unique combination of mental and physical impairments make him poorly suited for gainful employment.  *See* 20 C.F.R. § 416.913(d) (permitting consideration of such opinions as "other source" evidence).

questionable;" that plaintiff "has trouble following medical advice," and that

he may need "a more restrictive setting sometime in the next year or two."

*Id.*

The record also contains two statements from DSS Nurse Carole

Truesdell.  AT 365, 698.  In the first statement, which is undated, Nurse

Truesdell describes her interaction with plaintiff, noting, *inter alia,* that

Riegler "has persistent disturbances of mood, impulsive and damaging

behavior [and] marked difficulties maintaining social functioning as he can

not cope with any people," and concluded that plaintiff was a "mentally

disturbed person."  AT 365.  In the second statement, dated July 20, 2000,

Nurse Truesdell notes that plaintiff has spinal surgery, that she has

worked with plaintiff over "the past few years," and that she has "never

seen him appearing as ill as he does now."  AT 698.

Also included within the record is the testimony of plaintiff's DSS

caseworker, Steven Diffendale, from the October 14, 1999 hearing during

which he testified that plaintiff is grossly immature for his stated age, has

problems concentrating and an "alcohol problem," and is unable to work

"on a specific kind of complicated task for very long."  AT 70.

In his decision ALJ Stephan discusses the November 10, 1999 letter

from the various DSS personnel letter, but unfortunately fails to state the weight given to the letter.  AT 23-24.  A different situation obtains with respect to the opinion of Nurse Truesdell and testimony Mr. Diffendale.  In remanding the matter following the ALJ's prior decision, the Appeals Council noted that the ALJ failed to discuss or evaluate Nurse Truesdell's undated statement, as well as the testimony of Mr. Diffendale.  AT 174.  The Appeals Council then gave the ALJ specific instructions to "evaluate witness testimony, in accordance with the disability regulations pertaining to evaluation of symptoms (20 C.F.R. [§] 416.929 and Social Security Ruling 96-7p."  AT 175.  A review of the ALJ's more recent decision, however, reveals that he failed to discuss the opinion of Nurse Truesdell and testimony of Mr. Diffendale, as he was instructed to do by the Appeals Council.  AT 174-75.

Although under the regulations, a registered nurse and personnel of a public and private social welfare agency are not "acceptable medical sources", *see* 20 C.F.R. § 416.913(a), (d)(1), (3), an ALJ may consider their opinions as "other source" evidence.  20 C.F.R. § 416.913(d).  Social Security Ruling ("SSR") 06-03p, provides that an ALJ "generally should explain the weight given to opinions from [ ] 'other sources.'"  SSR 06-03p,

2006 WL 2329939, at *6 (S.S.A. 2006).

To me, it is readily apparent that the ALJ erred in failing to follow the Appeals Council's instruction to evaluate or discuss the opinions of Nurse Truesdell and Mr. Diffendale.  A better practice, particularly in view of the Appeals Council's ruling, would have been to discuss and explain the weight given to the opinions of these individuals, as well as of the DSS personnel who submitted the November 10, 1999 letter.  Consideration of these opinions was plainly significant, given that the DSS has arranged for plaintiff's medical and other services since 1998; that Nurse Truesdell worked with plaintiff "over the past few years;" and that Mr. Diffendale, plaintiff's caseworker, has known plaintiff since February 1998.  AT 66, 477, 698.  In short, the ALJ should have evaluated all of the evidence from the DSS personnel, and explained what if any weight he assigned to those materials, but failed to do so, providing yet another basis for reversal of his determination.

     b. <u>Department of Social Services and Dr. Hameed</u>

Plaintiff argues that the ALJ discussed "the input" from the DSS and from his treating psychiatrist, Dr. Hameed, but "never clarifie[d]" their

opinions of total disability.  Dkt. No. 8 at ¶ 20.[18]  AT 477-78.  A review of

the ALJ's decision reveals that he addressed the DSS letter dated

November 10, 1999, and detailed its findings, in considerable length.  AT

23-24.  It should be noted, however, that contrary to plaintiff's argument,

the letter did not include an opinion that plaintiff was "totally disabled."

Dkt. No. 8 at ¶ 20.  Instead, the letter suggests that plaintiff's "survival

skills seem questionable;" that plaintiff "has trouble following medical

advice," and that he may need "a more restrictive setting sometime in the

next year or two" all findings that the ALJ included in his decision  AT 23-

24, 477-78.  The portion of plaintiff's claim relating to this communication

is thus unavailing, since the ALJ discussed the Department's findings, and

because it does not include a stated opinion that plaintiff was "totally

disabled."

Turning to Dr. Hameed, the ALJ discussed that individual's findings

in detail, and reviewed several of his conclusions, including that plaintiff

"could not be gainfully employed."  AT 22.  Accordingly, to the extent that

plaintiff is arguing that the ALJ failed "to clarify" Dr. Hameed's finding of

---

[18]    Plaintiff asserts that the ALJ "discuss[ed] the input" from the DSS.  Dkt.
No. 8 at p 5.  It thus appears that he is referring to the November 10, 1999 letter from
DSS personnel, since the ALJ did not discuss any other information from the DSS.
*See* AT 23-24.

total disability, this claim is unavailing because the ALJ clearly noted this finding in his decision.[19]  Moreover, I note that the ALJ was unable to find plaintiff disabled based on this statement alone, inasmuch as it speaks to the ultimate issue at hand – that is, whether plaintiff is disabled and cannot work.  *See Snell*, 177 F.3d at 133 (the "ultimate finding of whether a claimant is disabled and cannot work is 'reserved to the Commissioner.'");  20 C.F.R. § 416.927(e)(1).

> c.   Dr. Erney

Plaintiff argues that the ALJ "ignored and thus failed to clarify" the employability assessment completed by plaintiff's "treating physician," Dr. Erney.  Dkt. No. 8 at ¶¶ 23-24.  Plaintiff's counsel asserts that he forwarded that employability assessment to ALJ Stephan on October 10, 2003 by facsimile transmission.  *Id.*  Defendant argues that there is no evidence indicating that the ALJ received the report, which was submitted

---

[19]   To the extent plaintiff is arguing that the ALJ had a duty to contact Dr. Hameed for clarification of his report, this argument is unpersuasive, since there is no suggestion that Dr. Hameed's report contained a conflict or ambiguity requiring resolution, failed to contain all the necessary information, or did not appear to be based on medically acceptable clinical and laboratory techniques.  *See* 20 C.F.R. § 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques.").

38

"only a short time before the ALJ issued his decision," and that in any event it was considered by the Appeals Council.  Dkt. No. 12 at pp. 22-23.

The record does not definitively indicate, one way or the other, whether the ALJ received the disputed assessment.  AT 560-561.  It does, however, establish that the Appeals Council received the assessment, which was made part of the record as Exhibit AC-1, prior to making its review determination.[20]  AT 4.

Assuming *arguendo* that the ALJ received this report before he rendered his decision, I nonetheless do not find that the ALJ erred by failing to refer to it in his decision.  As was previously noted, an ALJ is not required to address and reconcile every shred of evidence with his or her determination.  *See Jones*, 2004 WL 3158536, at *6 (ALJ not obligated to address specifically each piece of evidence);  *Barringer*, 358 F. Supp. 2d at 79 ("[F]ailure to cite specific evidence does not indicate that it was not considered.") This claim, then, is unavailing as a basis for setting aside the Commissioner's determination.

d.   Dr. Kovi

---

[20]      There is some suggestion that the assessment may have been submitted by the plaintiff directly to the Appeals Council, since it is stated twice in plaintiff's brief that "Appellate Exhibit 1 [(the assessment)] was submitted as new evidence."  Dkt. No. 8 at ¶¶ 4, 25.

Plaintiff argues that the ALJ "ignored and thus failed to clarify" an October 28, 2002 report completed by one of plaintiff's treating physicians, Dr. Gabriella Kovi, of the Pain Management Center, showing that plaintiff experienced "severe pain."  Dkt. No. 8 at ¶¶ 5, 26.  That report, however, is clearly discussed by the ALJ in his decision.  AT 30.  While the ALJ did not specifically recite Dr. Kovi's notation that plaintiff was experiencing "severe spine pain," he noted plaintiff's treatment history with Dr. Kovi and other portions of the report.  *Id.*  The claim that Dr. Kovi's report was ignored by the ALJ therefore lacks merit.

### 3.    The ALJ's Impartiality

Plaintiff alleges that ALJ Stephan "abandoned his role as an impartial trier of the facts and became an advocate against the claimant." Dkt. No. 8 at ¶ 27.

The governing regulations of the Commissioner provide that "an administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party . . . " 20 C.F.R. §§ 404.940, 416.1440.  Moreover, "due process requires an impartial decision-maker in administrative proceedings."  *D'Amato v. Apfel*, No. 00 Civ. 3048, 2001 WL 776945, at *5 (S.D.NY. July 10, 2001), *aff'd* 43 Fed. Appx. 415 (2d Cir.

40

2002) (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)).

"However, there is a presumption of honesty and integrity in those who

serve as adjudicators for administrative proceedings."  *Id.* (citing *Winthrow*

*v. Larkin*, 421 U.S. 35, 47 (1975)).  This presumption can be overcome

only by "'a showing of conflict of interest or some other specific reason for

disqualification.'"  *Id.* (quoting *Schweiker*, 465 U.S. at 195).

In this case, plaintiff has not met this standard.  Plaintiff suggests no

conflict of interest or other specific reason for disqualifying ALJ Stephan,

but instead merely cites generically to "all the evidence and argument" set

forth in his brief to support this claim.[21]  Dkt. No. 8 at ¶ 27.  Such an

approach is insufficient to overcome the well-entrenched presumption of

honesty and integrity.  *See D'Amato*, 2001 WL 776945, at *5 (citations

omitted).  To the extent that ALJ Stephan may have erred, the record does

not indicate that his mistakes were a product of dishonesty or a lack of

integrity, as opposed to being attributable to the complexity of the case

and the extensive, often conflicting, evidence in the record.  In light of the

foregoing, I find plaintiff's conclusory argument regarding ALJ bias to be

unavailing.

---

[21]    I note that the plaintiff has not requested that the court remand the matter
to a different ALJ.  *See* Dkt. No. 8.

4.    <u>After Acquired Evidence</u>

Plaintiff argues that the Appeals Council erred by failing to remand

this matter in light of the new Employability Assessment completed by Dr.

Erney.  Dkt. No. 8 at ¶¶ 4, 25.  Defendant counters that the Appeals

Council properly determined the Assessment did not provide a basis for

changing the ALJ's decision.  Dkt. No. 12 at pp. 23-24.

The new evidence in issue was considered by the Appeals Council,

which nonetheless denied plaintiff's request for review of the ALJ's

decision.  AT 1e-4.  The Appeals Council's decision specifically referenced

the additional evidence, as well as two letters from plaintiff's counsel, but

concluded that "this information does not provide a basis for changing the

Administrative Law Judge's decision."  AT 2.

The Social Security regulations expressly authorize a claimant to

submit new and material evidence to the Appeals Council when requesting

review of an ALJ's decision.  20 C.F.R. §§ 404.970(b), 416.1470(b); *Perez*

*v. Chater*, 77 F.3d 41, 43 (2d Cir. 1996).  Even when the Appeals Council

declines to review the ALJ's decision, however, the new evidence

submitted by the claimant nonetheless becomes part of the administrative

record – the regulations require the Appeals Council to "evaluate the

entire record including the new and material evidence submitted . . . [and]

review the case if it finds that the [ALJ's] action, findings, or conclusion is

contrary to the weight of the evidence currently of record."  20 C.F.R. §§

404.970(b), 416.1470(b); *Perez*, 77 F.3d at 45 (quoting § 404.970(b)).

When the Appeals Council denies review after considering new evidence,

then, the Commissioner's final decision "necessarily includes the Appeals

Council's conclusion that the ALJ's findings remained correct despite the

new evidence." *Perez*, 77 F.3d at 45 (citation and internal quotation

marks omitted).

These rules are not without their limitations, however; to be properly

considered, post-hearing evidence must be new and material, and must

relate to the period on or before the ALJ's decision.  *Perez*, 77 F.3d at 45.

Specifically, evidence is "new" if it is not merely cumulative of what is

already in the record, and is "material" if it is both 1) relevant to the

claimant's condition during the time period for which benefits have been

denied – that is, the period on or before the ALJ's decision, and 2)

probative – in other words, that there is a "reasonable probability that the

new evidence would have influenced the Commissioner to decide the

claimant's application differently." *Webb v. Apfel*, No. 98-CV-791, 2000

WL 1269733, at *14 (W.D.N.Y. Feb. 8, 2000) (citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir.1990)).

In this case the employability assessment indicates that plaintiff has been Dr. Erney's patient since July 22, 2003, and was last examined on September 5, 2003.  AT 561.  No other evidence describes plaintiff's functional abilities during the period of July to September 2003.  As such, I find that the employability assessment is "new" because it is not merely cumulative of what is already in the record.  The assessment is also "relevant", since it pertains to the plaintiff's condition during the time period for which benefits have been denied – that is, the period on or before the ALJ's October 30, 2003 decision.  *See* AT 561.  Accordingly, the question remains whether the employability assessment is "probative" such that there is a "reasonable probability" that it would have influenced ALJ Stephan to decide plaintiff's application differently.

Preliminarily, it should be noted that to the extent that the employability assessment addresses the ultimate issue of disability, it is not probative; the ultimate issue of disability is a matter expressly reserved to the Commissioner.  20 C.F.R. §§ 404.1527, 416.927; *Snell*, 177 F.3d at 133 (citing 20 C.F.R. § 404.1527).

A comparison of the consultative examiners' opinions on which the

ALJ "relied chiefly" in determining plaintiff's RFC and the new

employability assessment suggests that plaintiff's condition worsened after

the most recent consultative examinations were performed.  *See* AT 34.

Addressing plaintiff's physical functioning on December 13, 2000, for

example, consultative examiner Dr. Wootan opined that plaintiff "is able to

engage in activities which require sitting, standing, walking, and stairs.  He

can lift and carry with some restriction, but not a significant restriction, 20-

25 pounds.  He can handle small objects without difficulty . . . He has full

use of both upper and lower extremities . . ."  AT 652.  In the employability

assessment, in contrast, Dr. Erney indicated that plaintiff was limited

"moderately" in his abilities to lift, carry, push, pull, bend, and use hands.

AT 560.

The same holds true with respect to plaintiff's mental functioning.

Also on December 13, 2000, consultative examiner Dr. Payne expressed

her view that plaintiff could follow and understand simple directions and

instructions; perform simple rote tasks under supervision; consistently

perform simple tasks and learn new tasks; and perform complex tasks with

supervision.  AT 663.  Dr. Payne also opined that plaintiff would have

45

"some difficulties" making appropriate decisions; maintaining attention and concentration; and would have difficulties relating with others and dealing with the normal stresses of a competitive workplace.  *Id.*  Dr. Erney, on the other hand, found that plaintiff was "very limited" in his abilities to understand and remember instructions and maintain attention/ concentration, as well as limited "moderately" in his abilities to carry out instructions, additionally commenting that plaintiff has a "poor memory." AT 560-61.  Once again, the foregoing comparison therefore suggests that plaintiff's condition has worsened since the most recent consultative examinations, on which the ALJ specifically relied in finding no disability. Accordingly, I find that had this more recent employability assessment been considered, there is a reasonable possibility that the ALJ would have decided the case differently.  Reversal of the Commissioner's determination is therefore required.

It should further be noted that the employability assessment in question also reflects that plaintiff was taking, or at a minimum was prescribed, Diazepam which is used for the management of anxiety disorders or for short-term relief of the symptoms of anxiety.[22]  AT 560.

---

[22]    Diazepam, also known as Valium, is indicated for the management of anxiety disorders or for short-term relief of the symptoms of anxiety.  *Physicians' Desk*

This contradicts the ALJ's assertion that plaintiff "is not undergoing . . .

current active ongoing course of treatment for any type of psychiatric

condition."  AT 31.  Armed with this new information, I find that there is a

reasonable possibility that an ALJ could well reach a different conclusion,

and that a reversal is thus required.  *See Douglas v. Barnhart*, No. 05 Civ.

1838, 2006 WL 276731, at \*9 (S.D.N.Y. Jan. 26, 2006) (holding that based

on newly submitted evidence, the Commissioner's stated reasons for

determining plaintiff's RFC were no longer supported by substantial

evidence) (citation omitted); *Tai-Fatt v. Barnhart*, No. 04 Civ. 9274, 2005

WL 3206552, at \*12 (S.D.N.Y. Nov. 30, 2005) (remanding for

consideration of new evidence).

    D.   <u>Scope of Remand</u>

As relief, plaintiff asks that the court remand the matter to the

Commissioner with a directed finding of disability, for the limited purpose

of calculating benefits.

Section 405(g) of the Social Security Act provides for two types of

remands: remands pursuant to sentence four of that section, and those

pursuant to sentence six.  42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501

---

*Reference* 2957 (59th ed. 2005).

U.S. 89, 97-98, 111 S. Ct. 2157, 2163 (1991) (citing *Sullivan v. Finkelstein,*

496 U.S. 617, 623-27, 110 S. Ct. 2658, 2662-66 (1990)). Sentence four

provides that:

> [t]he court shall have power to enter, upon the
> pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of
> the Commissioner of Social Security, with or
> without remanding the cause for a rehearing.

42 U.S.C. § 405(g). As this language plainly suggests, sentence four

contemplates the entry of judgment upon the pleadings, as well as based

on a transcript of the record below.[23]

---

[23]   Sentence six of section 405(g), by contrast, provides that:

> [t]he court may, on motion of the Commissioner of Social
> Security made for good cause shown before the
> Commissioner files the Commissioner's answer, remand
> the case to the Commissioner of Social Security for further
> action by the Commissioner of Social Security, and it may
> at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing
> that there is new evidence which is material and that there
> is good cause for the failure to incorporate such evidence
> into the record in a prior proceeding; and the Commissioner
> of Social Security shall, after the case is remanded, and
> after hearing such additional evidence if so ordered, modify
> or affirm the Commissioner's findings of fact or the
> Commissioner's decision, or both, and shall file with the
> court any such additional and modified findings of fact and
> decision, and a transcript of the additional record and
> testimony upon which the Commissioner's action in
> modifying or affirming was based.

*Id.* Sentence six, then, contemplates remand in one of two situations – where the
agency requests remand before answering the complaint ("clause one"), or where new,

As can be seen, the court retains the discretion to modify or reverse the decision below and, if deemed appropriate, to remand the matter to the agency in order to allow gaps in the evidentiary record to be filled, or discerned errors addressed. *E.g., Rosa v. Callahan,* 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996). Alternatively, when there is no reason to believe that remand would serve any useful purpose the court may, in its discretion, deem it appropriate to remand solely for a calculation of benefits. *Balsamo v. Chater,* 142 F.3d 75, 82 (2d Cir. 1998). In this instance the evidence, particularly that generated during the later years in question, convincingly establishes plaintiff's inability to perform in a work environment. Two separate individuals involved with employment placement working with the Mental Health Association of Columbia-Greene Counties, Inc., expressed their collective professional beliefs in May of 2003, based upon their interaction with Riegler and "ongoing communications with his medical providers", that plaintiff "cannot perform any meaningful employment of any type now,

---

material evidence is presented that was for good cause not presented before the Administration ("clause two"). Id.; *Shalala v. Schaefer*, 509 U.S. 292, 297 n.2, 113 S. Ct. 2625, 2629 n.2 (1993) (citing *Melkonyan*); *Melkonyan*, 501 U.S. at 100 n.2, 111 S. Ct. at 2164 n.2; *Raitport v. Callahan,* 183 F.3d 101, 104 (2d Cir. 1999); *Medina v. Apfel,* No. 00 CIV. 3940, 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001). This case presents neither of these situations.

or in the foreseeable future." AT 556. This opinion is echoed in a separate letter dated August 14, 2003, from one of those two individuals, advising that based upon having provided services to the plaintiff "for a number of years" the agency had "not seen any discernable improvement as to his ability to be able to perform any type of meaningful employment." AT 558. These findings are entirely consistent with the conclusions of psychiatrist Dr. Hameed who, based upon two interviews of the plaintiff in October of 1999, opined that plaintiff "can not [sic] be engaged in any gainful employment." AT 476. Those conclusions are further supported by findings of Dr. Tracy Erney who, in or about September of 2003, concluded that plaintiff is "very limited" in understanding and remembering instructions, and in maintaining concentration, and moderately limited in the abilities to carry out instructions, make simple decisions, and function in a work setting at a consistent pace. AT 560.

Based upon these persuasive indicators that in light of his unique combination of physical and mental limiting conditions plaintiff is unable to perform in a work environment, and in light of the fact that his benefits application has been pending for nearly nine years, I find that it would be unjust and unwarranted to remand the case to the agency for further

consideration.  *See Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir. 2000)

(ordering remand for the sole purpose of calculation of benefits where the

Commissioner had failed to meet the burden at step five and when

remand could have resulted in further substantial delay to resolution of

applications that had been pending for six years).  Accordingly, I vacate

the Commissioner's determination and remand the matter to the agency,

with the directed finding of disability, for the limited purpose of calculating

benefits owing to the plaintiff.

IV.   <u>SUMMARY AND ORDER</u>

     While I reject plaintiff's assertion that ALJ Stephan demonstrated

bias in his determination, the record in this case firmly establishes his

failure to follow the exceedingly specific directives of the Appeals Council,

laid down when the matter was remanded to him following his first

decision finding no disability, and specifically the requirement that he

address and discuss the significance of certain evidence and the weight, if

any, assigned to it.  The record also reveals the existence of new

evidence which was both non-cumulative and relevant to the plaintiff's

condition during the pertinent times, and should have resulted in reversal

of the matter and a remand on this basis.

The proceedings generated by plaintiff's application for SSI benefits, filed in April in 1998, have been pending for nearly nine years.  In light of this fact, as well as the overwhelming evidence from a variety of sources familiar with plaintiff's circumstances, reflecting that in their view he would be wholly unable to exist within the workforce given his many mental and physical conditions and their resulting limitations, in reversing the Commissioner's determination I will direct a finding of disability and remand of the matter to the agency solely for the purpose of conducting a prompt calculation of benefits owing to the claimant.

It is therefore hereby

ORDERED that plaintiff's motion for judgment on the pleadings is GRANTED, the Commissioner's determination VACATED, and the matter REMANDED to the Agency, with a directed finding of disability, for the sole purpose of calculating SSI benefits owing to the plaintiff as a result of that finding.

Dated:     March 30, 2007
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge